UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| *ex rel*. DAVID R. VAVRA and | § | |
| JERRY HYATT, | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 1:04-CV-00042 |
| | § | |
| KELLOGG BROWN & ROOT, INC. | § | |
| Defendant. | § | |

## FIFTH AMENDED ORIGINAL COMPLAINT

The United States of America, joined by Plaintiffs David R. Vavra and Jerry Hyatt, for their fifth amended original complaint, allege:

## I. AMENDMENTS

The purpose of the amended complaint is to streamline the pleadings for trial. The most recent complaint is the culmination of years of investigation by the Department of Defense and Federal Bureau of Investigation. Prior complaints have formed the basis for criminal prosecutions and several civil settlements. Although some additional, specific facts have been included in this amendment, Defendant Kellogg Brown & Root, Inc., ("KBR"), is very familiar with all allegations and causes of action.

The Fifth Amended Complaint is focused solely on gratuities and kickbacks provided to KBR from subcontractors awarded the transportation contracts known as Logistics Civil Augmentation Program, ("LOGCAP").

1

## II. INTRODUCTION

1.     This is a civil action to recover damages and civil penalties on behalf of the United

States of America for violation of the Anti-Kickback Act, 41 U.S.C. § 8702-8707.

## III. JURISDICTION AND VENUE

2.     This Court has jurisdiction over this action under 31 U.S.C. §3732 and 28 U.S.C. §1345,

since one or more of the original Defendants transact business in this District.

3.     Venue is proper in the Eastern District of Texas under 31 U.S.C. §3732 and 28 U.S.C.

§1391(b) and (c) because one or more of the original Defendants transacted business in this

District.

## IV.  PARTIES

### RELATORS

4.     Relators are individuals who are citizens of the United States, suing on behalf of the

Department of Defense, ("DOD"), which is an agency, and instrumentality of the United States

and its operations and obligations are paid by funds from the United States Treasury.  The United

States has elected to intervene in the action against KBR.

### DEFENDANT

5.     KBR is a foreign business corporation who may be served through its registered agent,

Capitol Corporation Services, Inc., at 800 Brazos, Suite 400, Austin, Texas 78701.  Service is not

necessary at this time.

### TRUE PARTY

6.     This True Party in Interest action is filed on behalf of the United States which has chosen

to intervene.  Service of the complaint on the appropriate representatives of the United States is

not necessary.

28575.1214327

7.     The Secretary of Defense, the United States Department of Justice and United States Attorney for the Eastern District of Texas are before the court through their attorney of record, Michael W. Lockhart.

## V. BACKGROUND

8.     Beginning with the conflict in Bosnia and continuing through all subsequent foreign conflicts in Kosovo, Afghanistan and Iraq, the United States military has contracted with private entities for transportation of equipment and supplies to support operations abroad.  The use of civilian contractors to provide support services to the United States military was under a series of contracts known as Logistics Civil Augmentation Program ("LOGCAP").  KBR received the initial LOGCAP Task Order contract for the Bosnian conflict.  This contractual arrangement between the Pentagon and KBR was extended to subsequent foreign conflicts, LOGCAP II in Kosovo, and including the war on terrorism in Afghanistan and Iraq, LOGCAP III.  KBR was awarded these contracts because of its extensive foreign experience and unique ability to implement the military's complex contingency plans on extremely short notice.

9.     The LOGCAP contracts require that, among other terms, KBR deliver combat service support under any condition at any location around the world.  Based on its performance of providing United States troops in Bosnia with housing, food, water, laundry, heavy equipment and other supplies under the original LOGCAP contract, KBR was awarded an unprecedented ten-year deal in December 2001 to supply similar logistical support to United States military operations around the world.  The existing relationship resulted in KBR also receiving the exclusive LOGCAP II and LOGCAP III contracts.

10.     The LOGCAP programs pay KBR through a cost-plus arrangement, meaning KBR is guaranteed to recover its expenses, and receive a set profit.  Under these arrangements, KBR has been paid billions of dollars.

3

28575.1214327

11.    KBR performs the contractual duties using resources from within its company and also relies on separate subcontracting entities to provide specialty services and supplies.  It is typical for the sub-contractual agreement between KBR and its subcontractors to also be structured on a cost-plus basis.  KBR would then pass the total costs of using subcontractors to the United States.  Often, in order to provide supplies and services in accordance with military specifications and timetables, several layers of subcontractors were used.  In each instance, these subcontractor costs, such as materials or transportation were passed up through the contractual chain.  KBR was then invoicing the government under LOGCAP cost-plus standards.  It is KBR's responsibility to administer and supervise the use of subcontractors in an appropriate and contractually required manner.

## APPLICABLE STATUTES

12.    In order to maintain its position as the exclusive of LOGCAP contractor, KBR is required to certify its compliance with the requirements of the Federal Acquisition Regulations, ("FAR"). FAR provides a specific contractor code of business ethics and conduct.

13.    The purpose of the Anti-Kickback Act is to eliminate the practice of subcontractors paying fees to employees, or of granting gifts or gratuities to employees of cost-reimbursable prime-contractors, or of higher tier subcontractors, for the purpose of securing the award of subcontracts.  A kickback means any money, fee, commission, credit, gift, thing of value or compensation of any kind which is provided directly or indirectly, to any prime contractor, prime contractor employee, subcontractor or subcontractor employee for the purpose of obtaining favorable treatment with a contract.  Kickbacks which are incorporated in a conspiracy to commit fraud on the government give rise to a cause of action under the FCA.

28575.1214327

## STATEMENT OF FACTS

14.    In December 2001, the U.S. Army Operations Support Command, located at the Rock Island Arsenal, Rock Island, Illinois, awarded the LOGCAP III prime contract to KBR.  The Army Field Support Command, also located at the Rock Island Arsenal, was the procurement command which administered LOGCAP III, and obligated and committed the funding for the prime contract.

15.    Under LOGCAP III, KBR provided goods and services to the U.S. Army in Kuwait, Iraq, and elsewhere, according to specific requirements set forth in task orders issued by the Army. Each task order incorporated a statement of the work required and the period of time within which it was to be performed.

16.    KBR commonly used subcontractors to fulfill its obligations under LOGCAP III task orders.  The subcontractors invoiced KBR for their work, and KBR was responsible for paying the subcontractors. KBR, in turn, invoiced the government for the cost of the work done by the subcontractors, plus KBR's allowable fees.  KBR acts as the government's regulatory agent for the use of subcontractors.

17.    Among the Army's requirements to be accomplished through the LOGCAP III prime contract was the transportation of U.S. military equipment and supplies into Iraq on air cargo flights to the Baghdad International Airport.

18.    At all times relevant to this fraudulent scheme, Robert Bennett was KBR's Corporate Traffic Supervisor for the LOGCAP III prime contract and was stationed in Houston, Texas. Bennett, along with other KBR employees, was responsible for the day-to-day supervision of its transportation subcontracts with KBR. KBR's Transportation Department in Houston administered hundreds of millions of dollars in transportation subcontracts for LOGCAP III alone. KBR profited mightily through the cost-plus contractual payment arrangement.

28575.1214327

19.    At various relevant times between 2002 and 2008, KBR also employed James Bennett, James Ramirez, Melissa Page and Anita Anderson in the Transportation Department. Each individual performed services under the LOGCAP III contract. The individual subcontractor employees identified below who provided the gratuities and kickbacks to KBR employees were the subcontractor representatives for the LOGCAP III transportation services.

20.    In order to attempt to ensure that its employees complied with the requirements of FAR, KBR supposedly had corporate-wide zero tolerance preventing its employees from accepting gratuities. Prohibited gratuities included anything of value such as golf outings, lunches, dinners, alcoholic drinks and paid entry to sporting and social entertainment. These prohibitions were contained in KBR's Code of Business Conduct (CBC). Specifically included in the prohibitions are situations where an outside supplier provides gratuities to a KBR employee with the understanding that the employee will purchase entertainment of a similar value in the future – taking turns buying.

21.    Each KBR employee, including the Bennetts, Robert and James, (father and son), Ramirez, Page and Anderson received, a written copy of the CBC. Additionally, each employee was annually required to take an online training course on the CBC. After completing the course, the employee is provided with a certificate of completion on an annual basis.

22.    Beginning in 2002, KBR entered into a subcontract for the LOGCAP III air-freight forwarding services with EGL, Inc., also known as Eagle Global Logistics, ("EGL") a publicly-traded U.S. corporation headquartered in Houston, Texas. The subcontract with EGL was designated as Master Agreement Number GU36-HOU-A003.

23.    EGL had offices, warehouses, and other facilities in Dubai in the United Arab Emirates. EGL's flights into Baghdad originated in Dubai, and were made on aircraft operated by a

28575.1214327

Middle-Eastern air charter company.    Well after the incidents forming the basis of this complaint, EGL was acquired by an unrelated, uninvolved third-party, CEVA.

24.    At all times relevant to this fraudulent activity described, Kevin Smoot was EGL's Managing Director of its headquarters office at Houston.    Also, at all times relevant, Thomas Kessner was an employee of EGL with LOGCAP III subcontract responsibilities.

25.    Robert Bennett, and KBR employees including his son and others under his supervision, had direct contact with EGL employees, including Smoot and Kessner, on the logistical requirements for transporting military goods to Iraq, Afghanistan and Kuwait under the LOGCAP III prime contract.  Bennett also reviewed invoices submitted by EGL to KBR.

26.    In 2005, following the EGL subcontract, KBR subcontracted its air-freight forwarding services with Panalpina, Inc. a Swiss-based, multi-national transportation company with several locations throughout the United States.

27.    At all times relevant to this fraudulent activity described, Grant Wattman was a procurement agent for Panalpina. Wattman had direct contact with Robert Bennett and KBR transportation employees involved with the LOGCAP III freight transportation subcontract.

28.    During the period from on or about January 24, 2002, through April 29, 2005, Smoot and Kessner provided kickbacks of fees, gifts, gratuities, things of value, and compensation of any kind, namely, meals, drinks, golf outings, and tickets to rodeo events, baseball games, football games, and other entertainment performances.  Kickbacks were provided to at least five different employees in KBR's Transportation Department, including KBR's Corporate Traffic Supervisor, Robert Bennett, James Bennett, Ramirez, Page and Anderson for the purpose of improperly obtaining and rewarding favorable treatment in connection with subcontracts under LOGCAP III, a prime contract.

28575.1214327

29.     During approximately the same time that EGL was improperly influencing a segment of KBR's Transportation Department, Wattman, of Panalpina, was also providing thousands of dollars of bribes and kickbacks, primarily meals and entertainment to Robert Bennett and his cronies.

30.     During the period from on or about January 24, 2002, through in or about January 2007, KBR through its authorized agent, Robert Bennett and others in the KBR Transportation Department accepted kickbacks, gratuities, and things of value and compensation, namely, meals, drinks, golf outings, and other gifts and entertainment, on at least 226 different occasions, which were provided for the purpose of improperly obtaining and rewarding favorable treatment in connection with subcontracts EGL and Panalpina, Inc. held under KBR's LOGCAP III prime contract.

31.     The precise detrimental effect and increased danger of this illegal conduct by KBR to the military personnel in the war theater is indeterminable.

32.     As reflected by the volume and duration of the criminal acts, graft and the expectation of gifts and gratuities were an ingrained part of the business culture at KBR.  The corporate mindset and defiance of the Army's contracting regulations was a barrier to honest, law-abiding companies seeking to provide services to the military.

33.     KBR failed to implement and maintain appropriate institutional oversight of its Transportation Department.  Notably, the corruption was not limited to an isolated incident or a single employee but systematically continued for years.  The improper influence by EGL and Panalpina was an ongoing manner of operation.  At least five (5) KBR employees were known to be involved in the scheme.  During the same period of time, KBR was continuously and falsely certifying its compliance with FAR to the United States.

8

34.     KBR's lack of control and compliance continued for a number of years.  The fraudulent scheme ceased only after Relators exposed the conspirators.  KBR's response has been a well-rehearsed effort to minimize its exposure.  These misguided efforts include the twisted rationalization that the only harm incurred by the government was the specific dollar amount of the bribes or there is nothing wrong with a few business meals.  It is indicative of this attitude that most of the gratuity recipients continued to be employed by KBR.

35.     After the kickbacks, gratuities and undue influence was brought to KBR's attention by the United States, the pattern of conduct was belatedly halted.  The subsequent fallout reflected the magnitude of the extensive scheme.

36.     On July 20, 2007, Smoot pled guilty to violations of the Anti-Kickback Act in violation of Title 41, United States Code, Sections 53(1) and 54.  During his announced guilty plea,

> Smoot admitted that from in or about January 2002, through in or about April 2005, he provided or authorized the providing of entertainment and other gratuities to five KBR Houston-based Transportation Department personnel, who were prime contractor employees, for the purpose of improperly obtaining and rewarding favorable treatment in connection with LOGCAP III transportation subcontracts.  Such gratuities, which KBR policy prohibited its employees from receiving, included meals, drinks, golf outings, and tickets to rodeo events, baseball games, football games, and other entertainment performances.
>
> He also admitted that during the period from about February 18, 2002, through April 29, 2005, Smoot personally provided gratuities to KBR personnel on approximately 90 different occasions worth a total of approximately $25,337.  In addition, during the period from about January 24, 2002, through March 25, 2005, the defendant authorized Kessner, a subordinate EGL employee, to provide gratuities totaling approximately $8,494.  Thus, the total amount of gratuities that the defendant either personally provided or authorized was approximately $33,831.
>
> Smoot testified that he knew that it was illegal for him and Kessner to pay gratuities to KBR personnel involved in the LOGCAP III prime contract between KBR and the U.S. Army.  Beginning in June 2004, in order to conceal the fact that gratuities were being unlawfully provided to KBR transportation department personnel involved in LOGCAP III subcontracts, Smoot and Kessner began a practice of either falsely listing the names of the recipients of the gratuities on

28575.1214327

their respective EGL expense reports, or simply not identifying the recipients by name on them.

37.     On August 28, 2008, Robert Bennett pled guilty of violations of the Anti-Kickback Act of Title 41, United States Code, Section 53(2) and 54.  During his announced guilty plea,

> Robert Bennett admitted that he knowingly and willfully solicited, accepted, or attempted to accept any kickback, that is, any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to any prime contractor, prime contractor employee, subcontractor, or subcontractor employee for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract.

38.     During the period from in or about March 1, 2004, through or on about April 29, 2005, Robert Bennett accepted gratuities from Kevin Andre Smoot and other EGL employees at Smoot's direction on at least 40 different occasions.  Such gratuities included meals, drinks, golf outings, and other gifts and entertainment.

39.     Once the ongoing scheme and pattern of abuse was revealed and the DOD investigators confronted KBR, the corporate reaction was predictable.  All known and involved Transportation Department employees still employed with KBR at the time of the revelation were disciplined through termination or suspension.  This was akin to closing the gate long after all the cows has escaped.  It is believed that several of the kickback recipients are still employed by KBR.

40.     Typical of the impediment established by KBR's fraud was the experience of Relator Vavra and his employer.  Vavra was employed by the worldwide transportation company DHL as a Regional World Trade Manager.  He has decades of experience in the air-freight forwarding industry.  Vavra specialized in heavy cargo shipments such as the subcontracts issued by KBR. Repeatedly, in an effort to obtain shipping contracts from KBR, Vavra would bid DHL's services at its cost with no profit margin or even at a loss.  Vavra and DHL were not, however, willing to engage in the unethical and criminal conduct which KBR required to obtain its freight

10

28575.1214327

forwarding contracts on a regular basis.   As a result, the KBR Transportation Department typically directed most of the contracts to its preferred vendors.  Not coincidentally, a majority of the preferred vendors were their partners in crime.

41.     The true damage to the United States and its Armed Forces by KBR's fraud will never be known.   The actual number of honest, valid bids from other qualified companies which were ignored or denied in order to return the expected favors to EGL and Panalpina can only be numerically estimated.   During this time, EGL and Panalpina were awarded hundreds of millions of dollars in transportation subcontracts.   By wrongfully using higher priced subcontractors, KBR increased its profits on a cost plus basis.  The artificial inflation cost precious dollars which could have been directed elsewhere in the war effort.   While KBR's conduct was ongoing, it continuously falsely certified compliance with FAR.

42.     The insidious nature of the damage done through the forbidden conduct was widespread in the Transportation Department.   Once the conspirators crossed the line into the criminality of bribes and gifts, the skids were greased for other types of fraud as well.   It was a direct result of the ongoing entertainment that KBR looked away while EGL perpetuated other fraudulent schemes on the United States.

43.     As KBR's Corporate Traffic Supervisor for the LOGCAP III prime contract and responsible, along with other KBR employees, for the day to day supervision of EGL's performance on its subcontracts with KBR.   At times, Robert Bennett reviewed invoices submitted by EGL to KBR in connection with EGL's subcontract work under the LOGCAP III prime contract.

44.     From on or about October 1, 2002, through on or about April 8, 2005, Christopher Cahill served as EGL's Regional Vice President for the Middle East and India, and was stationed at EGL's Regional Office in Dubai.  As such, Cahill was the highest-ranking EGL official in the

28575.1214327

region concerning the military shipments to Baghdad beginning in April 2003 under EGL's subcontract with KBR.  Bennett would have had frequent, direct contract with Cahill.

45.    From on or about November 22, 2003, and continuing to on or about April 4, 2005, while EGL's invoices were certified as being reviewed by the KBR Transportation Department, Cahill devised a scheme to defraud the United States and to obtain money by means of materially false and fraudulent pretenses and representations.

46.    In or about November 2003, EGL increased its air freight fees for transporting cargo into Baghdad through a "war risk surcharge" of  $.50 per kilogram of cargo which was added to each of EGL's invoices to KBR.

47.    It was part of the scheme that in or about November 2003, Cahill instituted a "war risk surcharge" of $.50 for each kilogram of freight transported to Baghdad under EGL's subcontract with KBR.  The company, which was physically transporting the air cargo to Baghdad for EGL, had not increased its fees for shipments into Baghdad on behalf of EGL.  EGL was not being charged additional war risk surcharge fees for the shipment of U.S. military equipment and supplies to Baghdad under its subcontract with KBR.  EGL recognized an opportunity to unilaterally institute war risk surcharges and thereby increase its profits.

48.    As KBR's Corporate Traffic Supervisor for the LOGCAP III prime contract, Robert Bennett would have been involved in the bid process for all air-freight forwarding contracts.  As a highly experienced supervisor, Bennett was also responsible for reviewing the EGL invoices submitted for payment.  It was KBR's duty to confirm the compliance and the content of the EGL invoices.  Despite the sudden appearance of an added war risk surcharge to EGL's invoices, KBR never questioned the increased cost nor made any attempt to substantiate the basis for the new expense.

28575.1214327

49.     It was further a part of the scheme that KBR caused the United States Government to pay it more for EGL's shipments of U.S. military equipment and supplies to Baghdad as a direct consequence of its institution of war risk surcharges.  KBR received fees as a portion of the fraudulent payments.

50.     Not surprisingly, the unquestioned approval of EGL's fraudulent invoices corresponds to the same time frame in which Bennett and other KBR employees were receiving gratuities from Smoot and other EGL employees.

51.     From on or about November 22, 2003, through on or about July 20, 2004, EGL, and its shipping company, performed approximately 379 air cargo shipments of military goods from Dubai to Baghdad under its subcontract with KBR and Work Releases issued thereunder.

52.     For each of those 379 air cargo shipments of military goods from Dubai to Baghdad during that time period, EGL submitted an invoice to KBR under the Master Agreement.  The total amount of the EGL invoices for those 379 shipments was approximately $13,263,629.00.

53.     KBR would or should have reviewed each invoice before approving and authorizing for payment.  Based on his experience, position, training and common sense, Robert Bennett knew or should have known the war risk surcharges were fraudulent.  KBR never questioned a single invoice or requested back up support for the war risk surcharge.  KBR's Transportation Department did, however, continuously accept many illegal favors from EGL during this time frame.

54.     EGL included in each of its invoices to KBR during that time period a war risk surcharge of $.50 for each kilogram of cargo shipped.  The total amount that EGL charged KBR for war risk surcharges during this time period was approximately $1,141,097.00.  In response, KBR paid EGL on each of those invoices.

28575.1214327

55.    KBR billed the United States Government for the non-existent war risk surcharges as a part of KBR's actual costs plus allowable fees for those particular air cargo shipments by EGL. KBR did so through approximately 141 public vouchers submitted during the period December 14, 2003, through August 31, 2004, to the Defense Contract Audit Agency under the LOGCAP III prime contract and applicable task order.

56.    KBR was subsequently paid by the Defense Finance and Accounting Service for the non-existent war risk surcharges claimed on public vouchers as a part of KBR's actual costs plus allowable fees for those particular air cargo shipments by EGL.  The amount paid to KBR for those air cargo shipments included approximately $1,141,097.00 in fraudulent war risk charges, plus KBR's allowable fees.

57.    The damage to the United States from EGL's war risk fraud, inter alia, has been recovered by prior settlement.  Nevertheless, tacit, unchallenged approval of the fraudulent invoices by KBR, the highly compensated gatekeepers of the LOGCAP III contract, demonstrates the insidious nature of kickback crimes.  It is impossible for the DOD to determine other similar harmful conduct by EGL and Panalpina which was overlooked by its gatekeeper such as over-crating, under-packing, missed deadlines, delayed transportation and etcetera.  The known and unknown conduct described above is the precise reason kickbacks are illegal.

58.    The precise detrimental effect and increased danger of this illegal conduct by KBR to the military personnel in the war theater is indeterminable.  The indeterminable increased harm and danger to military personnel in the war theater is precisely the reason Congress enacted civil penalties in addition to actual damages for violations of FCA and the Anti-Kickback Act.

59.    Mere payment of the total entertainment value by KBR is meaningless.

28575.1214327

## CAUSES OF ACTION

60.     Paragraphs 1 through 59 are hereby incorporated.

61.     This is an action brought on behalf of and with the United States under the Anti-Kickback Act, 41 U.S.C. § 8701 et seq. against KBR.

62.     For purposes of obtaining payment or approval for payment from the United States, KBR falsely certified compliance with the FAR code of ethics.

## PRAYER

For Relators, on behalf of the United States government, demand the following:

1.     judgment against KBR for twice the amount of each kickback involved in violation of the Anti-Kickback Act and $10,000 for each occurrence of prohibited conduct;

2.     judgment against KBR in the amount of the benefit the United States conferred upon KBR, pre-judgment interest, plus fees and costs, and a judgment declaring that those amounts are rightfully the property of the United States, and that KBR holds said proceeds in trust for the use and benefit of the United States; trust for the use and benefit of the United States; and

3.     all other relief this Court may deem just and equitable.

28575.1214327

Respectfully submitted:

John M. Bales
United States Attorney

/s/ Michael W. Lockhart

---

Michael W. Lockhart
Assistant United States Attorney
Texas Bar No. 12472200
350 Magnolia Avenue, Suite 150
Beaumont, Texas 77701-2237
Tel: (409) 839-2538 | Fax: (409) 839-2643
USATXE.CivECFBmt@usdoj.gov

STRONG PIPKIN BISSELL & LEDYARD, L.L.P.

/s/ Greg M. Dykeman

---

Greg M. Dykeman
State Bar No. 06325100
Stacie L. Augustine
State Bar No. 24050239
14th Floor, San Jacinto Building
595 Orleans
Beaumont, Texas  77701-3255
Tel:  (409) 981-1120 | Fax: (409) 981-1010
gdykeman@strongpipkin.com
saugustine@strongpipkin.com

/s/ Mitchell A. Toups

---

Mitchell A. Toups
State Bar No. 20151600
WELLER, GREEN, TOUPS & TERRELL, L.L.P.
2615 Calder Ave., Suite 400
Beaumont, Texas 77704-0350
Tel:  (409) 838-0101 | Fax: (409) 838-6780
matoups@wgttlaw.com
**ATTORNEYS FOR RELATORS,
DAVID R. VAVRA and JERRY HYATT,
On behalf of THE UNITED STATES**

28575.1214327

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been forwarded to all counsel of record via electronic filing on this 24th day of July, 2014.

*/s/ Greg M. Dykeman*

_____

Greg M. Dykeman

17